

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| WILBERT V. JOHNSON,<br>                            *Plaintiff,*<br><br>v.<br><br>COMMONWEALTH OF VIRGINIA *and*<br>THE RECTOR AND VISITORS OF THE<br>UNIVERSITY OF VIRGINIA,<br>                            *Defendants* | CIVIL NO. 3:06cv00061<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

This matter is before the Court on Defendants' motion to dismiss, filed on January 22, 2007 (docket entry no. 29). For the following reasons, this motion will be GRANTED in an order to follow.

## I. BACKGROUND

Plaintiff Wilbert V. Johnson ("Plaintiff") is suing pursuant to the Emergency Medical Treatment & Labor Act ("EMTALA"), codified at 42 U.S.C. § 1395dd.[1] He alleges in his amended complaint that he was transported to the University of Virginia Medical Center ("UVMC") on October 30, 2004, after he fell at his house that day; he complained of weakness, dizziness, and tremor. Plaintiff states that in recent weeks, he had fallen numerous times both in his home and in public and, as a result, he had made two other visits to a different hospital.

According to Plaintiff, Defendants failed to provide Plaintiff with an adequate medical screening examination in order to determine whether an emergency medical condition existed

---

[1] EMTALA is an "anti-dumping" statute and is not a federal malpractice statute. *See Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996) ("Numerous cases and the Act's legislative history confirm that Congress's sole purpose in enacting EMTALA was to deal with the problem of patients being turned away from emergency rooms for non-medical reasons.").

- 1 -

that would require further stabilization prior to transfer or discharge, as EMTALA requires. More specifically, Plaintiff claims that Defendants should have performed a Morse Fall Scale evaluation of Plaintiff. Additionally, Plaintiff claims that Defendants failed to provide the necessary stabilization treatment.

Defendants discharged Plaintiff without admitting him to the hospital and, obviously, without transferring him to another hospital. The amended complaint is not explicit about this, but evidently, as a result of Defendants' alleged failure to comply with EMTALA, Plaintiff suffered severe injuries, including "loss of ability to swallow, and to sit up without assistance, serious cognitive impairment and incontinence, and total renal failure." Plaintiff seeks $350,000 in compensatory damages.

Plaintiff initially sued UVMC and the treating physician, Edward Walsh. Those defendants moved to dismiss, arguing that Plaintiff's claim was not timely filed (it was timely filed), that UVMC is not a legal entity capable of being sued (it is not), and that individuals are improper EMTALA defendants (they are improper). Therefore, the Court dismissed UVMC and Walsh and allowed Plaintiff to amend his complaint to assert claims against the Commonwealth of Virginia ("Commonwealth") and against the Rector and Visitors of the University of Virginia ("University").

Defendants have filed motions to dismiss, arguing that sovereign immunity bars Plaintiff's EMTALA claim.

## II. STANDARD OF REVIEW

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999). In considering a Rule

12(b)(6) motion, a court must accept all allegations in the complaint as true, must draw all reasonable inferences in favor of the plaintiff, and should not dismiss unless the defendant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of [the plaintiff's] claim" that would allow the plaintiff relief. *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957); *see also Edwards*, 178 F.3d at 244; *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 254–55 (W.D. Va. 2001). Stated differently, a "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002).

As the Fourth Circuit has held, however, *Swierkiewicz* did not eliminate the requirement that a plaintiff "must sufficiently allege facts to allow the Court to infer that all elements of each of his causes of action exist." *See Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 344–45 (4th Cir. 2006), *reh'g en banc denied*, 467 F.3d 378 (4th Cir. 2006); *see also Inman v. Klöckner-Pentaplast of America, Inc.*, No. 3:06cv00011, 2006 WL 3821487, at *4 (W.D. Va. Dec. 28, 2006) (collecting post-*Swierkiewicz* holdings in Rule 12(b)(6) cases in the Fourth Circuit). But motions filed under Rule 12(b)(6) "should be granted only in very limited circumstances." *Rogers v. Jefferson-Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir. 1989).

## III. DISCUSSION

With certain exceptions, the Eleventh Amendment provides a bar to lawsuits brought by citizens in federal court against states that do not consent to such suits. *See Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974) ("While the Amendment by its terms does not bar suits against a State by its own citizens, this Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."). Because the Board of Rector and Visitors of the University of Virginia, which operates the hospital, is an arm

- 3 -

of the Commonwealth of Virginia, it is immune from suit. *See, e.g., Tigrett v. Rector & Visitors of the Univ. of Va.*, 97 F. Supp. 2d 752, 756 (W.D. Va. 2000) (stating that the Court "has already held that the Rector and Visitors of the University, as an instrumentality of the state, is immune from suit in federal court" and collecting cases). As this Court has previously held, the University-run hospital, too, is an arm of the state and enjoys sovereign immunity. *See Hall v. Roberts*, 548 F. Supp. 498, 500–01 (W.D. Va. 1982) ("[I]t is undisputed that the University of Virginia's Medical Center, which is composed of the hospital, the medical school and the nursing school, is ... an organ of the State."); *Lawhorne v. Harlan*, 214 Va. 405, 407 (1973) (stating that "[i]t has long been the settled law in Virginia that a hospital which is an organ of the state is immune, under the doctrine of sovereign immunity, from actions in tort" and finding the University's hospital to be an organ of the state), *overruled on other grounds by First Va. Bank-Colonial v. Baker*, 225 Va. 72, 78–79 (1983).[2] Therefore, the immunity analysis below applies equally to both the Commonwealth (as the state) and the University (as an arm of the state).

There are three exceptions to sovereign immunity, two of which may be implicated here. Plaintiff's claim can survive (a) if Congress, in passing EMTALA, both unequivocally expressed

---

[2] The parties filed briefs on the merits of Plaintiff's contention that recent Virginia legislation somehow changed the long-standing doctrine that the University enjoys sovereign immunity. Defendants noted that the so-called "charter bill," to which Plaintiff referred, was not enacted into law; instead, the state legislature passed the Restructured Higher Education Financial and Administrative Operations Act (RHEFA), codified at Va. Code Ann. §§ 23–38.88 to 23–38.121 (West 2007). RHEFA allows the University to apply for restructuring of some of its financial and operational authority by submitting a formal resolution to the General Assembly, then entering into an agreement with the Commonwealth that implements RHEFA subject to its constraints and continued state oversight. Defendants point out that although the University is released from some bureaucratic requirements and given some additional authority, it is still dependent on and subject to the General Assembly for both operating authority and annual appropriations. Additionally, RHEFA has not changed the fact that the University's revenues as a state agency are payable into the state treasury. RHEFA also states that the University is entitled to the same sovereign immunity to which it would be entitled if RHEFA did not exist. Defendants also state that University employees remain state employees, and are covered by the state retirement system, state health insurance program, state worker's compensation system, and the state grievance procedure system. The University's enabling legislation provides that the University remains subject to the control of the General Assembly. *See* Va. Code Ann. § 23–69 (West 2007). In response, Plaintiff states only that private funding (8.3% of the University's total funding) topped public funding (8.1% of the University's total funding) for the first time in the University's history. Defendants arguments are too persuasive: RHEFA does not appear to have changed the long-established rule that the University

its intent to abrogate the Commonwealth's immunity and acted pursuant to a valid exercise of its power or (b) if the Commonwealth has consented to suit under EMTALA. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996).[3]

## A. Congressional Override

The issue here is whether Congress has unequivocally expressed its intent to abrogate Virginia's immunity from suit under EMTALA; if the answer is yes, then Congress must have acted pursuant to a valid exercise of its power in order for Virginia's immunity to be legally abrogated. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996) ("In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has unequivocally expressed its intent to abrogate the immunity and second, whether Congress has acted pursuant to a valid exercise of power." (alteration omitted) (citation omitted) (internal quotation marks omitted)).

All relevant cases answer both questions in the negative. *See Crisp v. Univ. of Tex. Med. Medical Branch*, No. Civ. A. G-05-488, 2006 WL 1492378, at *2 (S.D. Tex. May 25, 2006) (unreported decision) (collecting cases). This is especially true following *Seminole Tribe*. *See Vazquez Morales v. Estado Libre Asociado de Puerto Rico*, 967 F. Supp. 42, 46 (D.P.R. 1997) ("Moreover, any intent by Congress to abrogate the states' Eleventh Amendment immunity in EMTALA would be unavailing in light of the Supreme Court's decision in *Seminole Tribe*."). In *Seminole Tribe*, the Supreme Court held that Congress may not abrogate states' immunity from suit when it acts pursuant to its Article I power—the source of power for enacting EMTALA. *See*

---

is an arm of the state and is entitled to sovereign immunity as discussed below.

[3] The third exception is the *Ex Parte Young* doctrine, "under which individual state officers can be sued in their individual capacities for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law." *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 506 (3d Cir. 2001); *see also Ex Parte Young*, 209 U.S. 123 (1908). This exception does not apply here.

- 5 -

*Seminole Tribe*, 517 U.S. at 72–73 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction."); *Vazquez Morales*, 967 F. Supp. at 46 ("The Social Security Act—of which the Medicare scheme, including EMTALA, forms a part—is an exercise of Congress' powers under Article I to tax and to regulate interstate commerce. Therefore, even if it so intended, Congress could not have abrogated the states' Eleventh Amendment immunity by enactment of EMTALA."); *see also* Mark J. Garwin, Immunity in the Absence of Charity: EMTALA and the Eleventh Amendment, 23 S. Ill. U. L.J. 1, 31–37 (1998) (analyzing Eleventh Amendment immunity with respect to EMTALA and concluding that "[i]t is evident that, although state sovereign immunity is subject to congressional abrogation, the Supreme Court has adopted strict standards by which claims of congressional abrogation of Eleventh Amendment immunity are to be evaluated, and EMTALA will fail to survive such scrutiny").

## B. Commonwealth Consent

Plaintiff's claim could survive, however, if the Commonwealth has waived its immunity. *See, e.g., Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) ("We have long recognized that a State's sovereign immunity is a personal privilege which it may waive at pleasure. The decision to waive that immunity, however, is altogether voluntary on the part of the sovereignty." (citations omitted) (internal quotation marks omitted)). The Supreme Court uses a strict test to determine whether a state has waived immunity and will find waiver only if the state voluntarily invokes federal-court jurisdiction or if the state "makes a clear declaration that it intends to submit itself" to such jurisdiction. *Id.* at 675–76 (internal quotation marks omitted).

There are two ways in which the Commonwealth can waive its immunity and consent to

suit: expressly or impliedly. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 491 (4th Cir. 2005). First, the Commonwealth could waive immunity "expressly in a state statute or constitutional provision, as long as the provision explicitly specifies the state's intention to subject itself to suit in federal court." *See id.* (internal quotation marks omitted). Second, the Commonwealth could waive immunity "implicitly by voluntarily participating in federal spending programs when Congress expresses a clear intent to condition participation in the programs ... on a State's consent to waive its constitutional immunity." *Id.* (internal quotation marks omitted).

### *1. Express Consent*

Quite simply, the Commonwealth of Virginia has not expressly waived its Eleventh Amendment immunity from suit in federal court. The Commonwealth has made a limited waiver of its immunity in the Virginia Tort Claims Act, but that act "does not waive the state's [E]leventh [A]mendment immunity." *See McConnell v. Adams*, 829 F.2d 1319, 1329 (4th Cir. 1987).

### *2. Implied Consent*

There is an appealing argument to be made here. The Commonwealth is participating in EMTALA, a federal program. EMTALA, a part of the Social Security Act, requires hospitals to "file[] with the Secretary an agreement ... to adopt and enforce a policy to ensure compliance with the requirements of section 1395dd of this title and to meet the requirements of such section" in order to be eligible for Medicare reimbursement. *See* 42 U.S.C.A. § 1395cc(a)(1)(I)(i) (2007). So, the argument goes, because the Commonwealth must not only "meet the requirements" of § 1395dd, but must also file an agreement to do so with the Secretary of Health and Human Services, the Commonwealth (and, therefore, the University) must have consented to suit.

But the mere fact that the Commonwealth has agreed to "meet the requirements" of § 1395dd does not, alone, mean that the Commonwealth has impliedly consented to suit. In *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, the Supreme Court rejected such an argument:

> The whole point of requiring a "clear declaration" by the State of its waiver is to be certain that the State in fact consents to suit. But there is little reason to assume actual consent based upon the State's mere presence in a field subject to congressional regulation. There is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity. In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals. That is very far from concluding that the State made an "altogether voluntary" decision to waive its immunity.

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 680–81 (1999).

Here, the federal program at issue is not necessarily directed at state-run hospitals. Instead, it is directed at hospitals who have elected to receive federal reimbursement, whether those hospitals are private or public. Although it is true that the Defendants' hospital is voluntarily participating in EMTALA, a federal spending program, it is not the case that Congress has expressed a clear intent to condition that participation on the Commonwealth's consent to waive immunity. In other words, the Congressional language is geared toward hospitals that participate in the Medicare reimbursement program; it is not geared toward a state that just so happens to operate a hospital that participates in the Medicare reimbursement program.

But the fact that the participating hospital must *actually file an agreement* with the federal government to "adopt and enforce a policy to ensure compliance with the requirements of section

1395dd of this title and to meet the requirements of such section" may hold some weight. In *Lanman v. Kalamazoo Psychiatric Hospital*, No. 263665, 2006 WL 73747, at *6–*7 (Mich. Ct. App. Jan. 12, 2006) (unpublished decision) (Davis, J., concurring in part and dissenting in part), Judge Davis first noted that there is no case law on point, then stated that he was unwilling to conclude that the defendant state-run hospital had not waived immunity because, in part, the hospital had to file such an agreement with the federal government.

In *Lanman*, the Plaintiff's decedent (Eugene H. Lanman) was taken by police officers to a hospital, which determined that Lanman needed inpatient psychiatric care. The officers transported Lanman to the defendant hospital,[4] which admitted Lanman for long-term psychiatric care and placed him in a "quiet room." Lanman later became agitated, was subdued, and received an injection of a calming drug. During the altercation, he stopped breathing and later died. Lanman's personal representative sued the hospital, alleging a breach of contract and a violation of EMTALA. The trial court denied summary judgment for the hospital but the Michigan Court of Appeals reversed and remanded.

In the per curiam opinion, the court held that the EMTALA claim was improper because Lanman was not transferred from the defendant hospital but was instead admitted to it. Therefore, the court explicitly withheld judgment on the immunity claim. Judge Davis, who concurred with the disposition of the breach of contract claim, wrote an opinion in which he disagreed with the disposition of the EMTALA claim.[5] Assuming that his reading of EMTALA was correct, Judge Davis then discussed immunity and stated that he was unwilling to conclude

---

[4] The facts are not explicit in *Lanman* about how the defendant hospital was operated. Because the case delves into the immunity question, however, I assume that the hospital is at least partially run by the state of Michigan.

[5] Judge Davis argued that EMTALA requires a hospital to either provide stabilizing medical treatment or transfer the patient elsewhere; stabilization is required, according to Judge Davis, regardless of whether the hospital intends to transfer the patient.

-9-

that the defendant had not waived its immunity.

Judge Davis said that "through its action as a participating hospital," the hospital had agreed to the terms of EMTALA, "one of which is the civil action provided by 42 U.S.C. § 1395dd(d)(2)(A)," meaning that the hospital "would be amenable to suit despite ... the Eleventh Amendment." *Lanman*, 2006 WL 73747, at *6. "An agreement to 'adopt and enforce a policy to ensure compliance with the requirements of [§ 1395dd] and to meet the requirements of such section' is a precondition to the receipt of federal Medicare funding." *Id.* at *7. But because the agreement was not part of the record and because the "trial court is in a superior position to make the necessary inquiry into the existence and scope of any agreement that defendant executed with the federal government pursuant to its participation in the Medicare reimbursement program," Judge Davis "would not hold that an EMTALA claim is factually unsupportable, and I would neither confirm nor rule out a waiver of defendant's immunity." *Id.* at *7.

Although Judge Davis's insinuation that perhaps the defendant hospital may have consented to suit based on an explicit agreement makes logical sense, I am respectfully unwilling to extend *College Savings Bank* to cover such a situation.

In *College Savings Bank*, the Supreme Court was adamant that for a state to waive immunity, the waiver must be explicit and clear: "a State's express waiver of sovereign immunity be unequivocal." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 680 (1999). Here, the EMTALA agreement presumably[6] states what the law requires: that the hospital has agreed to *adopt* and *enforce* a policy that will ensure compliance with EMTALA. Based strictly on 42 U.S.C.A. § 1395cc(a)(1)(I)(i) (2007), there is no express and unequivocal waiver of sovereign immunity by a hospital that agrees to merely adopt and enforce a policy.

---

[6] The agreement is not before the Court; the Court assumes for purposes of this analysis that the agreement does

- 10 -

Indeed, the consequences of the hospital's failure to live up to the agreement are certainly relevant. Implicit in Judge Davis's argument is the assumption that should a public hospital fail to adopt or enforce an EMTALA-compliant policy, EMTALA gives an aggrieved party the right to sue. That is not necessarily the case, however: should a hospital fail to live up to the agreement, it *will no longer be eligible for Medicare reimbursement*, which, according to the text of the statute, is the purpose of a hospital filing an agreement to begin with. *See* 42 U.S.C.A. § 1395cc(a)(1)(I)(i) (2007) (requiring the agreement "in order to be eligible for Medicare reimbursement").

Again, a state can waive immunity "implicitly by voluntarily participating in federal spending programs *when Congress expresses a clear intent to condition participation in the programs ... on a State's consent to waive its constitutional immunity.*" *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 491 (4th Cir. 2005) (emphasis added) (internal quotation marks omitted). Here, Congress is conditioning participation on a hospital's agreeing to adopt and enforce a policy that complies with EMTALA. Failure to do so means only that the hospital may no longer receive federal funds. It cannot be said that a state-run hospital has agreed to be sued based on breach of the agreement; instead, it would be more fair to say that the state-run hospital has agreed to stop receiving federal reimbursement should it breach the agreement.

Plaintiff argues that the holding in *Root v. New Liberty Hospital District*, 209 F.3d 1068 (8th Cir. 2000), requires that the Court find that Defendants do not enjoy sovereign immunity. Plaintiff's reliance on *Root*, however, is misplaced.

In *Root*, the Eighth Circuit held that Missouri's sovereign immunity statute, which granted immunity to state hospital districts for suits claiming negligence and intentional torts,

---

not contain a "waiver of sovereign immunity" that is both "express" and "unequivocal."

directly conflicted with EMTALA, a federal law. *Root*, 209 F.3d at 1069, 1070. Because the two statutes directly conflicted, the Supremacy Clause "therefore dictates that Missouri's sovereign immunity statute must yield." *Id.* at 1070.

Defendants argue that this case is different because under Missouri law, the plaintiff could not bring an EMTALA suit against a hospital, but under Virginia law, the plaintiff could bring an EMTALA suit against a hospital (via the Virginia Tort Claims Act). Although probably true, this is of no consequence. Plaintiff similarly argues that the Defendants should not enjoy immunity because his EMTALA claim could not be properly brought in state court. This is not true, but is also of no consequence.

*Root* is inapplicable because the issue there was whether a state's grant of immunity to a *municipality* (in the form of a hospital district) directly conflicted with EMTALA. Here, the Commonwealth and, as an arm of the state, the University, enjoy *Eleventh Amendment* immunity. The Defendants' immunity derives not from a state statute authorizing such immunity, but instead from the Eleventh Amendment to the Constitution. The Eleventh Amendment immunity may "effectively immunize[] the actions of state governments from federal review, even when a state violates the most fundamental constitutional rights." *See* Erwin Chemerinsky, Constitutional Law: Principles and Policies 179 (2d ed. 2002). Therefore, there can be no "direct conflict" between a state grant of immunity and federal law (as was the issue in *Root*). The only possible conflict here would be between the Eleventh Amendment and EMTALA. Clearly under the Supremacy Clause, the Eleventh Amendment trumps federal law.

Regardless, plaintiff could have had recourse in state court. The Virginia Tort Claims Act provides a limited waiver of sovereign immunity in state court. *See* Va. Code Ann. § 8.01–195.1 to –195.9 (West 2007). A plaintiff seeking relief from the Commonwealth must comply with the

notice requirements in section 8.01–195.6. *See id.* § 8.01–195.6. A plaintiff must bring his claim within a year of its accrual. *See id.* § 8.01–195.7 ("Every claim cognizable against the Commonwealth ... under this article shall be forever barred, unless within one year after the cause of action accrues to the claimant the notice of claim required by § 8.01–195.6 is properly filed."). It appears from the record in this case that Plaintiff did not comply with the requirements of the Virginia Tort Claims Act and, as such, his claim in state court would likely be barred.

## IV. CONCLUSION

For the foregoing reasons, I conclude that the Commonwealth has not expressly or impliedly waived immunity. Because the Commonwealth has not waived immunity and because Congress has not abrogated the Commonwealth's immunity, Plaintiff's EMTALA claim cannot survive. I will not address Defendants' remaining arguments, including their assertion that Plaintiff failed to state a claim upon which relief can be granted. Defendants' motion will be GRANTED in an order to follow.

It is so ORDERED.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all parties and to all counsel of record.

ENTERED: /s/ 
United States District Judge

Date: May 24, 2007